WALTER TOEBE CONSTRUCTION
COMPANY and ACE STEEL ERECTION,
INC.,

    Plaintiffs,

-vs-

KARD WELDING, INC.,
d/b/a KARD BRIDGE PRODUCTS,

    Defendant.

_____/

Case No. 05-73605
Judge Avern Cohn

## MEMORANDUM AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

This is a contract case. In February 2005, the Michigan Department of Transportation ("MDOT") awarded a bridge construction contract to Interstate Highway, Inc. ("IHI"). IHI subcontracted a portion of the contract to Plaintiff Walter Toebe Construction Company ("Walter Toebe"), and Walter Toebe in turn subcontracted a portion of its contract to Plaintiff Ace Steel Erection, Inc. ("Ace"). Ace contracted to purchase custom fabricated steel for use in the construction project from Defendant Kard Welding, Inc. ("Kard"). Walter Toebe and Ace claim that Kard failed to deliver the steel at the time promised and sue for breach of contract, unjust enrichment, promissory estoppel, and fraud and misrepresentation. They seek damages to compensate them for penalties assessed by MDOT as well as loss of incentive bonuses, cover damages,

1

and other incidental and consequential damages.  Kard counterclaims for breach of contract seeking lost profits.

Before the Court is Kard's motion for summary judgment as to both Walter Toebe and Ace's claims and its own claims.  For the reasons that follow, the motion will be granted in part and denied in part.

## I.  Facts

The following are the facts as gleaned from the record presented in chronological order.

- In January 2005, MDOT solicited bids for bridge construction contracts on US-23 is Genesee County, Michigan.  Walter Toebe planned to bid for the contracts on two bridges as a subcontractor of IHI.  To that end, on January 31 Walter Toebe contacted several steel fabricators, including Kard, to inquire as to whether they would submit a bid to supply the steel components necessary to complete the projects.

    Kard indicated that it could supply the components, but that it would take some time to do so.  Due to an existing industry-wide shortage, it would take three to four months to obtain the necessary raw steel from a mill.  Kard would also require some months after obtaining the raw steel to fabricate the components.  This time frame put Walter Toebe in danger of missing project completion deadlines established by MDOT. Walter Toebe anticipated, however, that MDOT would grant an extension of the deadlines due to the existing steel shortage.

- MDOT set a deadline of February 4, 2005 for submission of bids on the US-23 projects.  That morning, Kard faxed Walter Toebe a quote to furnish and fabricate

2

steel for the two bridge projects on which Walter Toebe wished to bid. Kard did not send the quote to Ace, since at the time Kard expected to contract directly with Walter Toebe. The quote listed price terms and stated Kard's expectation that it would take three to four months to obtain the necessary raw steel, but did not list specific dates by which Kard would deliver the fabricated units.

One line in Kard's quote reads "Completion Date 9/19/2005." The parties dispute the meaning of this phrase. Kard maintains that it intended only to list the MDOT target completion date of September 19, 2007 in order to identify the MDOT contract to which its bid pertained, and that the quote's reference to September 19, *2005* was a typographical error. Kard says that it did not intend by its quote to promise delivery of fabricated steel to Walter Toebe by September 19, 2005, or any other date. Walter Toebe says that it understood the quote as promising that Kard would fabricate the raw materials and deliver them to the jobsite no later than September 19, 2005.

The quote was accompanied by a document labeled "Kard Group Standard Terms and Conditions of Sale." This document provided that Kard's acceptance of any order from a buyer was expressly made conditional on assent to the terms and conditions included therein. It further provided that "acceptance by [buyer] of any materials from [Kard] Company shall be deemed to be Customer's assent to these terms and conditions." Among other substantive terms and conditions, the document purported to immunize Kard from "any damages for any delays in shipments" and to make enforcement of the contract subject to Ohio law.

- Later on the morning of February 4, Walter Toebe attempted to contact Kard by telephone and fax to obtain specific delivery dates, but was unable to get through due to technical problems. Regardless, Walter Toebe used Kard's quote in formulating its bid to IHI, which it submitted later the same day.

- On February 22, Kard sent a fax to Walter Toebe requesting "anticipated due dates" for several shipments of fabricated steel. The next day, Walter Toebe supplied dates by which delivery would be required if Walter Toebe were to comply with the scheduled MDOT completion deadlines. The fax called for four shipments of fabricated steel, the earliest to be made by April 24, 2005 and the latest by August 26, 2005. Walter Toebe employee William Deacon ("Deacon") noted in the fax that compliance with the MDOT deadlines "is possibly not going to happen" due to the anticipated extension, but that Walter Toebe "cannot make any changes to the contract until after award [of the contract]."

- On February 24, Kard sent another fax to Walter Toebe indicating that it would not be able to meet the schedule proposed in the February 23 fax from Walter Toebe and proposing a later delivery schedule, with the first shipment due by September 1, 2005 and the last by February 1, 2006. Kard cautioned, however, that these dates were only estimates.

- MDOT awarded the contract to IHI on March 16, 2005. IHI executed a subcontract with Walter Toebe on March 18, and Walter Toebe subsequently subcontracted with Ace.

- Kard says that on March 22, Walter Toebe instructed it to order the raw steel necessary for the project; Walter Toebe denies this. In any case, Kard began soliciting quotes for the raw steel on March 22.

- On March 23, a Kard employee placed a call to Deacon at Walter Toebe to discuss the delivery schedule. Deacon's handwritten notes of the conversation indicate that Kard proposed a delivery schedule different from the one it had proposed in the February 24 fax. In the March 23 conversation, Kard proposed to deliver four shipments of fabricated steel between September 9, 2005 and December 12, 2005.

- On March 30, Walter Toebe instructed Ace to issue a Purchase Order for the fabricated steel to Kard. Deacon specifically instructed Ace that "[t]he delivery dates are to meet the original schedule but Kard says they cannot meet these dates. I want them to cross out the dates and put their best guess dates."

- On March 31, Kard issued a Purchase Order for the raw steel to Nucor Corporation. Kard says that the same day, it learned for the first time that, in order to comply with MDOT's minority enterprise requirements, Walter Toebe would subcontract the steel fabrication with Ace, and Ace would in turn subcontract with Kard. Accordingly, Kard provided Ace with a copy of the quote it had sent to Walter Toebe on February 4. The contract between Walter Toebe and Ace is not included in the record; it is unclear what duties Ace assumed in this contract.

- On April 6, Ace issued a purchase order ("the original purchase order") to Kard for the fabricated steel. The original purchase order proposed delivery dates for

5

each of four shipments, the earliest to be made by April 29, 2005 and the latest by July 15, 2005. The original purchase order stated "[i]t is our understanding that Kard Bridge cannot meet these dates. Please advise ASAP what your delivery dates will be."

- Kard revised the original purchase order, changing several terms and adding the "Terms and Conditions" document that it had included with the February 4 quote. Kard signed and delivered this purchase order ("the executed purchase order") to Ace on April 15. In response to the request for delivery dates, Kard stated it was "checking on this" and would "respond ASAP."

- Kard faxed Walter Toebe its proposed delivery dates on April 26. Kard proposed to make four deliveries, the earliest by August 15, 2005 and the latest by February 2, 2006. Kard noted in the fax that the proposed dates were based on "pessimistic" estimates of when Kard would receive the raw steel from Nucor. Neither Walter Toebe nor Ace agreed to these dates.

- On May 4, persons representing Walter Toebe and Kard met at Kard's facility in Ohio. Deacon says that at the meeting, Kard agreed to a delivery schedule whereby it would make its first delivery by July 5, 2005 and its last by October 10, 2005. Kard denies agreeing to this delivery schedule.

- Ace issued a purchase order to Kard for the fabricated steel on May 4. The purchase order provides for four deliveries from Kard, the earliest on April 29, 2005 (a date that had already passed) and the latest on July 15, 2005. The purchase order notes that ""[i]t is our understanding that Kard Bridge can not meet these dates. Please advise ASAP what your delivery dates will be."

- On May 12, Kard sent a letter to Walter Toebe tentatively proposing new delivery dates, with the earliest delivery to be made by August 7, 2005 and the latest by December 19, 2005. Kard's Vice President Kenneth Osterloh ("Osterloh"), the author of the letter, emphasized that this schedule was only a "GUESS...based on limited info[rmation] from the mill."
- On May 27, Walter Toebe sent Kard a letter demanding that it deliver the fabricated steel on an earlier schedule than the one proposed in Kard's May 12 letter. The May 27 letter from Walter Toebe again contemplated four deliveries, with the earliest to be made by July 12, 2005 and the latest by October 5, 2005.
- Kard refused to accept the new delivery schedule and stated that it would continue to work according to the delivery schedule outlined in the May 12 letter. Kard sent Walter Toebe letters to this effect on June 2 and June 20; the latter correspondence states that "KARD has NEVER AGREED to meet ANY of your delivery requirements! NEVER were any of those dates attainable!"
- The parties met on June 27 to discuss the disagreement over the delivery schedule. On July 12, Deacon sent a letter to Kard reflecting a revised delivery schedule; Deacon says that the parties agreed to the revised schedule at the June 27 meeting. The letter calls for the first delivery to be made by July 18, 2005 and the last by October 3, 2005.
- Kard made its first delivery of fabricated steel to the jobsite on July 20. Shortly thereafter, on July 22, Kard began to contact Walter Tobe with concerns about payment, noting that several invoices were already overdue and several large

invoices were coming due in the near future. Walter Toebe disputed the validity of Kard's invoices and refused to pay.

- On August 23, Kard assessed that Walter Toebe had materially breached the contract by failing to pay and ceased work on the project.

- On August 25, Walter Toebe sent a letter to Kard claiming that Kard had breached the contract by failing to meet the relevant delivery dates and stating that it would pay the outstanding invoices only if Kard agreed to a new delivery schedule that called for all deliveries to be made by October 31, 2005.

- The same day, August 25, Walter Toebe and Ace filed this action in Oakland County Circuit Court.

- Kard removed the action to this Court on September 15, 2005.

- Ultimately, Walter Toebe contracted with another steel fabricator, PDM Corporation, to furnish the steel components that Kard had yet to deliver. PDM obtained the raw steel from Kard, completed the fabrication process, and delivered the fabricated steel to Walter Toebe.

## II. Legal Standard

Summary judgment will be granted when the moving party demonstrates that there is "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). There is no genuine issue of material fact when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

The nonmoving party may not rest upon his pleadings; rather, the nonmoving party's response "must set forth specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e). Showing that there is some metaphysical doubt as to the material facts is not enough; "the mere existence of a scintilla of evidence" in support of the nonmoving party is not sufficient to show a genuine issue of material fact. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986). Rather, the nonmoving party must present "significant probative evidence" in support of its opposition to the motion for summary judgment in order to defeat the motion. See Moore v. Philip Morris Co., 8 F.3d 335, 340 (6th Cir. 1993); see also Anderson, 477 U.S. at 249-50. Additionally, and significantly, "affidavits containing mere conclusions have no probative value" in summary judgment proceedings. Bsharah v. Eltra Corp., 394 F.2d 502, 503 (6th Cir. 1968).

The Court must decide "whether the evidence presents a sufficient disagreement to require submission to a [trier of fact] or whether it is so one-sided that one party must prevail as a matter of law." In re Dollar Corp., 25 F.3d 1320, 1323 (6th Cir. 1994) (quoting Anderson, 477 U.S. at 251-52). The Court "must view the evidence in the light most favorable to the non-moving party." Employers Ins. of Wausau v. Petroleum Specialties, Inc., 69 F.3d 98, 101 (6th Cir. 1995). Determining credibility, weighing evidence, and drawing reasonable inferences are left to the trier of fact. See Anderson, 477 U.S. at 255. Only where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law may summary judgment be granted. Thompson v. Ashe, 250 F.3d 399, 405 (6th Cir. 2001).

9

### III. Analysis

### A. Breach of Contract

### 1. Choice of Law

In a diversity action, the choice of law rules of the forum state apply. Glenway Ind., Inc. v. Wheelabrator-Frye, Inc., 686 F.2d 415, 417 (6th Cir. 1982) (citing Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487 (1941)). Therefore, Michigan choice of law rules apply here.

The first issue before the court is whether the choice of law provision in the "Kard Group Standard Terms and Conditions of Sale" is part of the contract, such that Ohio law governs the substantive aspects of the case. Kard included these terms and conditions both with the initial quote it furnished to Walter Toebe and with the executed purchase order of April 15. The record contains no indication that Walter Toebe ever objected to these terms and conditions.

Under these circumstances, the Michigan Uniform Commercial Code ("UCC") provides that "additional terms are to be construed as proposals for addition to the contract. Between merchants such terms become part of the contract unless: (a) the offer expressly limits acceptance to the terms of the offer; (b) they materially alter it; or (c) notification of objection to them has already been given or is given within a reasonable time after notice of them is received." MCL § 440.2207. In this case, both parties are merchants, as they deal in type of goods at issue here. See MCL § 2.104(1). Walter Toebe did not expressly limit acceptance to the terms of its offer and did not notify Kard of any objection to the choice of law provision. Consequently, the

dispositive issue when deciding whether the choice of law clause applies is whether the clause "materially alters" the parties' agreement.

Additional terms materially alter an agreement when they "result in surprise or hardship if incorporated without express awareness by the other party." MCL § 440.2207 cmt. 4. The comments list several examples of clauses which would materially alter a contract and result in surprise or hardship; a choice of law clause is not among them. Furthermore, the UCC, which governs this dispute, has been adopted by both Michigan and Ohio in essentially identical form. Walter Toebe will therefore not be subject to any surprise or hardship if the choice of law term is incorporated into the contract. The choice of law term is therefore part of the contract and Ohio law governs the substance of this case.

Kard also argues that the dispute should be governed by the common law of Ohio rather than the Ohio UCC. This is incorrect. Article 2 of the Ohio UCC applies to all "transactions in goods," "[u]nless the context otherwise requires." OHIO REV. CODE § 1302.02. The statute defines "goods," with certain exceptions not applicable here, as "all things (including specially manufactured goods) which are movable at the time of identification to the contract for sale." OHIO REV. CODE § 1302.01(A)(8). The transaction at issue in this case involved "goods," since the steel components fabricated by Kard were "movable at the time of identification to the contract for sale." The fact that Kard performed the "service" of fabricating the components from raw steel does not take the transaction out of the UCC, particularly in light of its express reference to "specially manufactured goods." "It is difficult to imagine a commercial product which does not require some type of service prior to its purchase, whether design, assembly,

11

installation, or manufacture...If the purchaser's ultimate goal is to acquire a product, the contract should be considered a transaction in goods, even though service is incidentally required." Neibarger v. Universal Cooperatives, Inc., 439 Mich. 512, 536 (1992) (interpreting identical provisions of Michigan UCC).

### 2. Terms of the Contract

The parties do not dispute that a valid contract was formed; both Walter Toebe and Kard assert claims for breach of contract in their pleadings. Rather, the dispute centers on the time by which Kard was required to make delivery of the fabricated steel components. The parties dispute whether the contract contained a term governing delivery date, and if so, when Kard was required to make delivery.

Kard urges that the delivery date term is contained in the April 26, 2005 facsimile from Kard to Walter Toebe, in which Kard proposed a four-stage delivery schedule with the first delivery to be made by August 15, 2005. Walter Toebe, however, denies that it ever assented to the proposed delivery term contained in the April 26 fax. Deacon expressly denies any such assent in his affidavit. Walter Toebe also points to a letter sent from Kard to Walter Toebe on May 12, 2005. In the letter, Kard makes reference to a tentative delivery schedule proposed at a May 4 meeting between the parties, and goes on to propose yet another tentative delivery schedule. Neither of the two schedules in the May 12 letter from Kard accords with the schedule in the April 26 facsimile. Moreover, Kard has not proffered any affirmative evidence tending to show that Walter Toebe or Ace ever assented to the delivery schedule contained in the April 26 facsimile.

Walter Toebe argues that the parties agreed to a delivery schedule at the May 4 meeting which called for the first delivery to be made by July 5, 2005. Walter Toebe also says that the parties agreed to modify this schedule at a June 27, 2005 meeting, with the modified schedule calling for Kard to make the first delivery by July 18, 2005. Deacon's affidavit supports this account, as does a letter that Deacon sent to Osterloh on July 12. However, Osterloh described the May 4 schedule as being merely a guess as to when delivery might be possible rather than a binding commitment in a letter he sent to Deacon on May 12. Kard also denies that it ever agreed to meet the schedule proposed at the June 27 meeting.

In short, the record does not disclose any term governing delivery dates to which both parties unambiguously assented. No document in the record reflects agreement between the parties on any particular delivery schedule. The parties advance conflicting accounts of their intent, both of which are supported by at least some record evidence. There is thus a genuine issue of material fact as to whether the parties agreed to a delivery date term as part of their contract. "[W]here reasonable minds might differ as to whether a party assumed a contractual duty...the issue is to be determined by the trier of fact." Bennett v. Heidinger, 507 N.E.2d 1162, 1165 (Ohio Ct. App. 1986).

In cases where a contract contains no term governing delivery date, the UCC provides that "[t]he time for shipment or delivery or any other action under a contract if not provided in this article or agreed upon shall be a reasonable time." OHIO REV. CODE § 1302.22(A). What is a reasonable time "depend[s] on such factors as the nature of

goods to be delivered, the purpose for which they are to be used, the extent of seller's knowledge of buyer's intentions, transportation conditions, the nature of the market, and so on." JAMES J. WHITE & ROBERT S. SUMMERS, UNIFORM COMMERCIAL CODE § 3-5 (5th ed. 2000); see also OHIO REV. CODE § 1301.10(B). Because there is a genuine issue of material fact as to whether the parties agreed to a delivery term as part of their contract, it is not clear whether § 1302.22(A) applies at all. If it does, the inquiry is highly fact-dependent and was not addressed in the parties' briefs. Summary judgment as to what constitutes a "reasonable time" for delivery is therefore inappropriate. See Int'l Contract Furnshings, Inc. v. Kalikow, 564 N.Y.S.2d 167, 168 (App. Div. 1991); Anderson & Nafziger v. G.T. Newcomb, Inc., 595 P.2d 709, 715 (Idaho 1979) (denying summary judgment because question of what is a "reasonable time" was for trier of fact).

### B. Fraud

Walter Toebe claims that Kard committed fraud on several occasions during the course of dealing between the parties. "The elements of fraud are: (1) that the charged party made a material representation; (2) that it was false; (3) that when he or she made it he or she knew it was false, or made it recklessly, without any knowledge of its truth and as a positive assertion; (4) that he or she made it with the intention that it should be acted upon by the other party; (5) that the other party acted in reliance upon it; and (6) that the other party thereby suffered injury." City of Novi v. Robert Adell Children's Funded Trust, 473 Mich. 242, 253 n.8 (2005).

First, Walter Toebe says that Kard falsely represented in its quote that it could deliver the fabricated steel by September 2005. Kard's quote does include a line

14

reading "Completion Date 9/19/2005." However, the fraud claim fails as to this alleged misrepresentation because there is no evidence that tends to show that Walter Toebe detrimentally relied on the date listed in the quote. Rather, the record indicates that Walter Toebe understood at the time that Kard had not promised delivery by any particular date. It is undisputed that Walter Toebe unsuccessfully sought to contact Kard after receiving the quote on February 4, 2005 in order to obtain delivery dates for the fabricated steel. Walter Toebe made a number of similar requests over the following weeks and months. There is no indication in the record that Walter Toebe understood Kard's quote as promising delivery by September 2005 or that Toebe took any action in reliance on such an understanding.

Next, Walter Toebe says that Kard falsely stated that its estimated delivery dates were based on pessimistic estimates of when it would receive the necessary raw steel and that Kard would seek to deliver the fabricated steel in advance of the estimated dates. According to Walter Toebe, Kard knew that it lacked the capacity to complete the work in advance of the estimated dates even if it received the raw steel more quickly than expected. In support of this claim, Walter Toebe points to notes taken by a Walter Toebe employee at a June 27, 2005 meeting, which include the statement "steel came in early July and Kard was backed up with previous work." Walter Toebe also relies on records showing that the workload at Kard facilities increased substantially between February 2005 and July 2005; it says that the records indicate that Kard was "overbooked" during the summer of 2005. This evidence tends to show that, in the event, Kard was too busy with other work to complete its work for Walter Toebe in

15

advance of the estimated delivery dates.  It does not at all tend to show that Kard knew that it could not deliver in advance of the estimated dates at the time it made the earlier statements.  Since knowledge of falsity is essential to a claim of fraud, and evidence tending to prove this element is wholly lacking, Walter Toebe's claim fails.  Kard's motion for summary judgment as to the claims of fraud will be granted.

### C.  Promissory Estoppel

Walter Toebe's claim for promissory estoppel fails because the parties agree that a contract exists between them and only dispute its terms.  Michigan law dictates that under such circumstances, the proper claim is for breach of contract; claims for implied contract or quantum meruit should not be considered.  <u>Shurlow Tile & Carpet Co. v. Farhat</u>, 60 Mich. App. 486, 491 (1975); <u>Campbell v. City of Troy</u>, 42 Mich. App. 534, 537 (1972).  "[P]romissory estoppel is an alternative theory of recovery where no contract exists; and, thus, it is a substitute for consideration."  <u>Advanced Plastics Corp. v. White Consol. Indus., Inc.</u>, 828 F. Supp. 484, 491 (E.D. Mich. 1993); see also <u>Huhtala v. Travelers Ins. Co.</u>, 401 Mich. 118, 133 (1977) ("Promissory estoppel...substitutes for consideration in a case where there are no mutual promises").  Kard is entitled to summary judgment on this claim.

### D.  Unjust Enrichment

Walter Toebe's claim for unjust enrichment will be dismissed because Kard has allowed it to take possession of any remaining raw steel for which Kard paid.  "In order to recover on a claim of unjust enrichment, the party asserting the claim must demonstrate that (1) a benefit was conferred upon the recipient; (2) that the recipient

16

had knowledge of that benefit; and (3) circumstances render it unjust or inequitable to permit the recipient to retain the benefit without compensating the party who conferred the benefit." Landskroner v. Landskroner, 797 N.E.2d 1002, 1016 (Ohio App. 2003). In its complaint, Walter Toebe says that Kard unjustly benefitted from maintaining possession of raw steel for which Walter Toebe paid. The parties now agree that Walter Toebe was able to retake possession of the raw steel and transfer it to PDM Corp. In order to complete the fabrication process. This action eliminates the factual basis for Walter Toebe's claim of unjust enrichment. The motion for summary judgment as to this claim will be granted.

### E. Claim and Delivery

For the same reasons, Kard is entitled to summary judgment on Walter Toebe's claim for "claim and delivery" of the raw steel. Walter Toebe has already retaken possession of the raw steel.

### IV. Conclusion

Under the circumstances of this case, it is conceivable that Walter Toebe could establish a breach of contract on either of two alternative grounds. First, Walter Toebe could introduce appropriate evidence to establish that Kard agreed to deliver the fabricated steel by a particular date but failed to do so. In the alternative, Walter Toebe could introduce evidence to show that the parties never agreed to a particular delivery schedule and that Kard failed to deliver within a reasonable time. As such, summary judgment is inappropriate, and Kard's motion is DENIED as to the breach of contract claim. For the reasons stated above, Kard's motion for summary judgment as to Walter

17

Toebe's claims for fraud, promissory estoppel, unjust enrichment, and claim and delivery is GRANTED.

SO ORDERED.

      s/Avern Cohn
AVERN COHN
UNITED STATES DISTRICT JUDGE


Dated: November 29, 2007

I hereby certify that a copy of the foregoing document was mailed to the attorneys of record on this date, November 29, 2007, by electronic and/or ordinary mail.

      s/Julie Owens
Case Manager, (313) 234-5160