UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


WALTER TOEBE CONSTRUCTION COMPANY
and
ACE STEEL ERECTION, INCORPORATED,

      Plaintiffs,

                                            Case No. 05-73605
-vs-                                  Hon:  AVERN COHN

KARD WELDING, INCORPORATED,

      Defendant.
_____/


**<u>DECISION</u>**

I.

      This is a commercial dispute tried to the Court over seven (7) days in September,

2008.

      Plaintiff Walter Toebe Construction Company (Toebe) is a highway bridge builder.

Plaintiff Ace Steel Erection, Inc. (Ace) is a steel girder erector.  For all practical purposes,

Ace was the alter ego of Toebe unless otherwise noted.

      Defendant Kard Welding, Inc. (Kard) is a steel girder fabricator.

      Toebe claims Kard defaulted on an agreement to fabricate steel girders for two (2)

bridges to be reconstructed by it as a subcontractor to Interstate Highway Construction, Inc.

(Interstate), who had a contract with the Michigan Department of Transportation to

reconstruct a portion of US 23 in Genesee County, Michigan.  Toebe says as a

consequence of Kard's default, it had to take the steel to be fabricated into the girders

1

elsewhere at an additional expense of approximately $400,000.00.

Kard in turn says Toebe defaulted on their agreement for fabrication in not timely paying invoices due and as a consequence it stopped the fabrication process. Kard says the unpaid invoices for work done is in the amount of approximately $400,000.00.

II.

A.

The background to the dispute is described in the:

- Memorandum and Order Granting In Part and Denying In Part Defendant's Motion for Summary Judgment (Dkt. 34) (Memorandum),

- Memorandum and Order Granting In Part and Denying In Part Plaintiffs' Motion for Reconsideration (Dkt. 36), and

- Memorandum and Order Denying Kard's Motion for Reconsideration (Dkt. 40).

B.

As noted in the Memorandum "the dispute centers on the time by which Kard was required to make delivery of the fabricated steel components."

As also noted in the Memorandum:

> In short, the record does not disclose any term governing delivery dates to which both parties unambiguously assented. No document in the record reflects agreement between the parties on any particular delivery schedule. The parties advance conflicting accounts of their intent, both of which are supported by at least some record evidence. There is thus a genuine issue of material fact as to whether the parties agreed to a delivery date term as part of their contract. "[W]here reasonable minds might differ as to whether a party assumed a contractual duty . . . the issue is to be determined by the trier of fact." Bennett v. Heidinger, 507 N.E.2d 1162, 1165 (Ohio Ct. App. 1986).

2

In cases where a contract contains no term governing delivery date, the UCC provides that "[t]he time for shipment or delivery or any other action under a contract if not provided in this article or agreed upon shall be a reasonable time." Ohio Rev. Code §1302.22(A). What is a reasonable time "depend[s] on such factors as the nature of goods to be delivered, the purpose for which they are to be used, the extent of seller's knowledge of buyer's intentions, transportation conditions, the nature of the market, and so on." James J. White & Robert S. Summers, Uniform Commercial Code § 3-5 (5th ed. 2000).

III.

A.

Testifying at trial for Toebe were:

- B. Thomas Stover — Stover was president of Toebe. He testified to Toebe's work as a bridge builder, a meeting with Kard, and his efforts to accelerate Kard's pace of fabrication

- William Deacon — Deacon was a vice president of Toebe and in charge of the Toebe-Kard relationship. He testified to Toebe's contract to reconstruct the two (2) bridges, Toebe's agreement with Kard to fabricate the steel girders for the bridges, the efforts to get Kard to fabricate the girders in time to meet MDOT requirements, and eventually taking the steel to a new fabricator.

- Randy Pou — Pou was president of Ace. He testified to the purchase order to Kard for fabrication and to the joint check arrangement under which Kard ordered the steel from the mills and Ace paid for the steel with the money coming from Toebe.

- David Obyc — Obyc was a Toebe employee. He testified to assisting Deacon in working with Kard to establish delivery dates for the steel girders and reviewing Kard's invoices.

B.

Testifying at trial for Kard were:

- Kenneth Osterloh — K. Osterloh was a principal owner of Kard. He testified to the Toebe-Kard agreement to fabricate the steel girders and the efforts to agree on a delivery schedule. He also testified to the breakdown of the Toebe-Kard relationship, the monies owed by

3

Toebe to Kard and eventually the fabrication work going elsewhere.

-       Doris Osterloh — D. Osterloh was a principal owner of Kard.  She testified to the Toebe-Kard relationship, billing Toebe for work done and the problems Kard encountered in getting payment on its invoices.

C.

There was a multitude of exhibits at trial.  Toebe initially listed 303 exhibits.  Kard initially listed 223 exhibits.  There was no effort pretrial to eliminate duplication.

Post-trial the parties lodged with the Court approximately 285 exhibits introduced at trial.  They included MDOT documents, letters, handwritten notes of meetings, faxes, invoices, quotations, purchase orders, e-mails and the like.

The most significant exhibits were those relating to the exchange of communications between the parties following a meeting on June 27, 2005, where an effort was made to agree on the date by which Kard would complete fabrication of the steel girders in time for Toebe to complete reconstruction of the bridges before the end of 2005 as required by MDOT.

IV.

The following are the relevant facts[1] adduced at trial focusing on the documentary trail of the exchanges between the parties beginning with MDOT's solicitation for bids for the US 23 project to the completion of reconstruction of the two (2) bridges.

1.      In December, 2004, MDOT advertised for bids for reconstruction of a portion

---

[1]  The parties' post-trial proposed findings of fact are excessively detailed.  The parties filed a Stipulation of Facts With Exhibit Citations (Dkt. 49) running 72 paragraphs.  Toebe's Post-Trial Findings (Dkt. 48) runs 141 paragraphs.  Kard's Post-Trial Findings (Dkt. 50) runs 171 paragraphs.  What follows is a distillation of all this.

of US 23 in Genesee County, Michigan.  Included in the reconstruction were two (2) bridges, S07 and S09.  S07 was a bridge under Hill Road; S09 was a bridge for I-75 over Bristol Road.  The two (2) bridges were included in the bid documents as separate projects. The bridges were to be reconstructed in two (2) stages, Stage I and Stage II, to keep traffic flowing.  The bid documents contemplated completion of reconstruction by the end of October, 2005, with provisions for extensions of the completion dates under defined circumstances.

2.      Kard, a steel fabricator, had knowledge of the bid documents and furnished a quotation for fabrication of the steel beams to prospective bidders based on the description of S07 and S09 in the bid documents.  The Kard quotation was directed to "ALL BIDDERS," and stated a "Completion Date" of "9/19/2005."   Kard knew from the bid documents that the completion dates could be extended under defined circumstances. Kard also knew as an experienced steel fabricator that once reconstruction of a bridge began, the bridge contractor had a limited time in which to complete reconstruction so that the bridge was again open to unobstructed traffic.

3.      Particularly the bid documents called for S07 to be reconstructed and open to traffic by August 15, 2005, and S09 to be reconstructed and open for traffic by October 1, 2005.  These dates could be extended by MDOT particularly if there was a industry-wide shortage of critical materials, which included raw steel.  Raw steel at the time was in short supply.  The bid documents included the following statements:

> 10.    The Department shall assess damages against any contractor who fails to have the job open to traffic or completed by the dates specified un the contract unless the contractor has been excused for such failure by the Department. . . .

. . . .

**PROGRESS CLAUSE:** . . .

> . . . .

> Because of the interference and inconvenience to interstate highway traffic on I-69, I-75, I-475 and Bristol Road, the surrounding businesses, General Motors and Bishop International Airport, it is essential that this work be completed as quickly as possible once work begins.  The Department has determined that this interference and inconvenience will result in major delays and backups to the interstate highway traffic and the surrounding communities.

4.    Toebe had knowledge of the Kard quotation and that it called for:

-    a joint check agreement of payment at the time of ordering the raw plate steel and the contractor to pay for the raw steel materials

-    payment for finished product within thirty (30) days of each invoice date

-    "DELIVERY OF MATERIAL FROM MILL TO US APPROX 3–4 MONTHS"

5.    Interstate was the successful bidder as general contractor.  Toebe was the successful bidder as the subcontractor for the bridge reconstruction portion of the Interstate bid.  Toebe's bid was directed to Interstate.

6.    In early February, 2005, Toebe told Kard that once it received a contract from Interstate it intended to buy the fabricated steel beams from Kard.  Kard followed up with a request to Toebe seeking the "anticipated due dates" for each stage of S07 and S09.

7.    On February 23, 2005, Toebe advised Kard of anticipated delivery dates as follows:

S07 Stage 1          April 24, 2005

6

S07 Stage 2          July 15, 2005

S09 Stage 1          June 14, 2005

S09 Stage 2          August 26, 2005

Toebe at the time anticipated a longer schedule for delivery dates given the timing of the

awarding of contracts and the nationwide steel shortage.

8.      On March 16, 2005, MDOT signed a contract with Interstate as general

contractor.  On April 4, 2005, Interstate entered into a subcontract for S07 and S09 with

Toebe.

9.      MDOT required that the utilization of a certain number of Disadvantaged

Business Enterprises (DBEs) be involved.  Because Ace qualified as a DBE, Toebe

subcontracted with Ace to erect the steel beams and Ace in turn to issue a purchase order

to Kard for fabrication.  Toebe, however, maintained control of the Kard fabrication work.

10.      On April 6, 2005, Ace at Toebe's direction issued a purchase order to Kard

for the fabrication of the steel beams for S07 and S09.  The purchase order read in part:

> 2.      Payments for materials will be paid when payment for
> such material is received by Ace Steel from the Prime
> Contractor.
>
> 3.      Delivery dates on plans are as follows:
>
> S07 Stage I          /      4-29-05
> S07 Stage II         /      7-15-05
> S09 Stage I          /      6-14-05
> S09 Stage II         /      5-6-05
>
> It is our understanding that Kard Bridge can not [sic] meet
> these dates.  Please advise ASAP what your delivery dates will
> be.  NOTE: Quote dated 2/4/05 to Walter Toebe payment to
> plate mill will be required at the time the PO is issued to the
> plate mill.

7

11.   Following the April 6, 2005, purchase order the record includes five (5) iterations, none of which changes the delivery date language and all of which have the "Payments for materials" language stricken.  After receipt of the purchase order Kard made changes in it before it was returned to Ace.  There is no record of Ace having signed off on the changes.  There is no document in the record signed by Ace and Kard or Toebe and Kard that memorializes the dates by which Kard obligated itself to deliver the steel beams for each stage of S07 and S09.

12.   On May 12, 2005, Kard wrote Toebe stating in part:

REF: Update on Schedule for Project: 77059A

When you were here on 05-04-05 we tried to figure out what our best delivery could be based on the mill deliveries we had.  At that time with the info we had from the mill we GUESSED:

| Stage 1 | S07 | 07-06-05 |
| Stage 2 | S07 | 09-19-05 |
| Stage 1 | S09 | 08-01-05 |
| Stage 2 | S09 | 10-08-05 |

Based on the current info attached WE CANNOT even guess when we will be able to ship!  Our hands are tied by the mills!!  Once we receive all materials from the mills we can then establish delivery dates.  It is almost IMPOSSIBLE to get mill information.

If I were to GUESS today based on limited info from the mill what I thought the delivery MIGHT be:

| Stage 1 | S07 | week of 08-07-05 |
| Stage 2 | S07 | week of 09-19-05 |
| Stage 1 | S09 | week of 11-01-05 |
| Stage 2 | S09 | week of 12-19-05 |

If the mill deliveries improve, we will improve the estimates above accordingly.

If I were you **I WOULD NOT** shut down bridge on 05-16-

8

05.

This was an unrealistic schedule given the MDOT requirement that S07 and S09 open to traffic before the end of the year, subject only to an extension under defined circumstances, which as of May 12, 2005, were highly unlikely.

13.     Under the schedule approved by MDOT, Toebe had 161 calendar days to complete reconstruction of S07 once it began, and 145 days to complete reconstruction of S09 once it began.  If Toebe did not meet these time limitations, it was subject to penalty damages.

14.     On May 27, 2005, Toebe advised Kard, "Now that all of the S07 material is at your facility MDOT is going to put us back on the clock" and also gave the following revised delivery schedule:

> S07 Stage 1      Deliver beginning July 12, 2005
> S09 Stage 1      Deliver by August 1, 2005
> S07 Stage 2      Deliver by September 12, 2005
> S09 Stage 2      Deliver by October 5, 2005

15.     On June 2, 2005, Kard advised Toebe:

> In response to your letter dated 5-27-05 below are the dates I will commit to.  We will try to improve.

The dates Kard referenced are the second set of dates in Kard's letter of May 12, 2005.  Delivery of the steel to Kard by the mills was not the problem Kard was having in meeting the dates set by Toebe.  The problem was that Kard had more business than it could handle, and did not give fabrication for S07 and S09 priority.

16.     On June 17, 2005, Toebe wrote Kard saying it was "mandatory that Kard fabricate in the following sequence in order to make the required delivery dates:"

> S07 Stage 1 (5 lines of beams) Deliver beginning July 12, 2005

9

          S09 Stage 1 (9 lines of beams) Deliver beginning August 1, 2005
          S07 Stage 2 (7 lines of beams)  Deliver beginning September 12, 2005
          S09 Stage 2 (9 lines of beams) Deliver beginning October 5, 2005

17.     On June 16, 2005, and again on June 20, 2005, Kard wrote Toebe objecting

to the delivery dates Toebe was insisting on and stating that Toebe had the opportunity to

take the job elsewhere.  Particularly these letters stated in part:

> Walter Toebe had the opportunity since at least 02-24-05 to split or completely take this project to another fabricator that MIGHT meet Michigan's schedule.  KARD at no time has EVER given you any info that would lead you to believe we could meet their delivery schedule.  (Letter of June 16, 2005.)

> KARD and Walter Toebe have **NEVER** agreed on delivery dates.  Walter Toebe has always had the option since 02-24-05 to take all or portions of this job elsewhere.  (Letter of June 20, 2005.)

18.     Prior to June 27, 2005, Toebe and Kard had never come to an agreement as

to the dates Kard obligated itself to complete fabrication of the steel beams necessary to

complete reconstruction of S07 and S09 by the end of 2005.  Rather, during this period

Toebe was insisting on delivery dates to enable it to complete S07 and S09 so the bridges

would be open to traffic prior to December 31, 2005, and Kard was insisting on delivery

dates later in time because of its work load.  These different dates are displayed in Exhibit

A attached.

19.     The exchange of letters led to a meeting between Toebe and Kard on June

27, 2005, in an effort to agree on delivery dates for the steel beams to Toebe, particularly

S09 Stage 2.  This was the critical delivery date Kard said it could not meet in time to

complete reconstruction of S09 before the end of 2005.  Each party took minutes of the

meeting.  The minutes when read together do not reflect that any agreement was reached

as to delivery dates.

20.     Toebe left the meeting believing that Kard had committed itself to complete fabrication of the steel beams for the S09 Stage 2 in time for Toebe to complete reconstruction of S09 by the end of 2005.  This is confirmed by the fact that on June 28, 2005, Toebe wanted to give MDOT notice it intended to begin construction of S09 "as soon as possible. . .we would like to begin demo on Monday, July 11th."  This meant Toebe had to complete reconstruction of S09 in approximately five (5) months.  If it did not complete reconstruction within five (5) months once it began, it would be subject to an assessment of damages by MDOT (see paragraph 3 above).

21.     Kard came away from the June 27, 2005 meeting with a different understanding of what was agreed to.  On July 1, 2005, Kard wrote Toebe stating in part:

> You had asked for info to produce a critical path fabrication schedule when you visited.  What this info DOES NOT account for is that KARD's fabrication capacity was filled to the max until at least 06-27-05.  There was and is no room to move forward any delivery dates.  Per your request we can fabricate S09 phase 1 ahead of S07 phase 2.  Below are delivery dates KARD will commit to as stated on 05-12-05 and adjusted on 06-27-05:
>
> | Stage 1 | S07 | week of 08-07-05 |
> | Stage 1 | S09 | week of 09-19-05 |
> | Stage 2 | S07 | week of 11-01-05 |
> | Stage 2 | S09 | week of 12-19-05 |
>
> Again, as stated in my letter dated 06-20-05 prior to shipment, I will need a letter [f]rom Walter Toebe stating KARD Welding, Inc. WILL NOT be held responsible for liquidated damages.  This is based on as long as KARD delivers on dates stated above in my letter dated today.  Walter Toebe will still be expected to pay net 30 days from invoice date on any and all of KARD's invoices.

22.     Delivery of raw steel by the mills was not a problem.  Kard issued purchase

11

orders for the steel on March 29, 2005, and March 31, 2005; all of the steel was delivered to Kard by mid-June, 2005.

23.     Toebe began reconstruction of S07 on May 16, 2005.  The estimated completion date was early October, 2005.  Toebe began reconstruction of S09 on July 11, 2005.  The estimated completion date was mid-November, 2005.  S07 reconstruction was completed and the bridge open to traffic on November 12, 2005.  S09 reconstruction was completed and the bridge open to traffic on December 27, 2005.  To the extent Toebe missed required completion dates, while MDOT initially assessed damages, it eventually waived damages.

24.     On July 12, 2005, Toebe responded to Kard's July 1, 2005 letter as follows in part:

> The delivery dates in your letter of July 1, 2005 were not in accordance with the conclusions reached at our meeting on June 27, 2005.  As you know, we want this to be a successful project for us all.  Liquidated damages can be avoided with your cooperation.
>
> Based on the activities and time durations you provided at the June 27th meeting, the revised CPM shows the girders can be shipped as follows:

|  | CPM Indicated Completion Date | Required Delivery Date |
|---|---|---|
| S07 Stage I | July 13, 2005 | July 18, 2005 |
| S09 Stage I | August 11, 2005 | August 15, 2005 |
| S07 Stage II | September 6, 2005 | September 7, 2005 |
| S09 Stage II | September 28, 2005 | October 3, 2005 |

> It is critical that these activities and durations are met in order to complete the project on time.  We have modified our construction schedule as much as possible giving Kard Bridge as much extra time as possible to complete fabrication, painting and delivery.  However, we are at the point of requiring

12

delivery of S07 Stage I beginning on Monday July 18, 2005.
This delivery needs to include the first 5 girder runs so we can
keep the project moving forward.   The first stage of S07
requires only the first 5 girder runs to be constructed.  We do
not want any additional girder runs delivered at this time.

25.     The follow-up to this letter by Kard on July 15, 2005, was unexceptional:

"These days CAN'T and WON'T be met."  On July 26, 2005, Toebe made inquiry of Kard

as to the status of S07 Stage 2 and S09 Stage 1.  Again on August 11, 2005, Toebe made

a similar inquiry.

26.     On August 12, 2005, Kard sent Toebe a Statement of Account with

accumulated invoices totaling $91,172.32 for work done and with the notation:

These invoices will be coming due in the next 1½ wks.  Are
they set up for payment at 30 day terms per quote/PO.

Kard's position that invoices for work done were to be paid within thirty (30)

days conflicted with Toebe's position that it paid for work done when it was paid.  It is not

clear that prior to the Statement of Account of August 12, 2005 any monies had been paid

by Toebe to Kard.

27.     On August 15, 2005, in response Toebe wrote Kard in part:

We continue to request status updates for the
fabrication of the S09 (Bristol Road) and S07 (Hill Road) bridge
girders and yet receive nothing back from Kard Bridge.  On
Friday, August 12th we received a fax from Kard Bridge
regarding payment requests submitted to Toebe.  Until we
have weekly fabrication status updates and open
communication between our two companies we can not [sic]
process payment requests since we have no way of knowing
what has been fabricated.

Both of these bridges are under construction so diligent
fabrication and delivery are critical to avoiding liquidated
damages being assessed by MDOT.  According to the CPM we
sent you based upon the information you gave us at our last

13

meeting Kard Bridge should be complete with the S09 Stage I girders and beginning the S07 Stage II girders. If there are any fabrication problems that may affect on time delivery we need to know this immediately.

28.    On August 17, 2005, Kard wrote Toebe in part:

We are now at the breaking point, either we agree on a revised delivery date that eliminates the threat of liquidated damages or KARD will stop all work immediately. . . .

. . . .

I have yet to send you a progress invoice for something that hasn't been delivered or completely fabricated ready to ship. Evidently the way your letter reads you will accept and pay progress payments. Is this true? On 08-21-05 we have a total of $91,172.37 due net 30 days from invoice date. If I am not paid in full by this day I will stop all fabrication just the same as you say in your letter you will not release payment.

29.    On August 17, 2005, Toebe in the person of Stover—all previous correspondence having been with Deacon—wrote Kard in part:

I read your letter of this morning and am responding because Bill Deacon is on vacation for the rest of this week. Unfortunately I can't reach him as he is visiting a location in Canada well beyond radio or phone contact.

Your letter makes it clear that you have your shop full of work and it appears things aren't going very well in the areas of collections and your fabrication schedules. From our meeting at your plant I learned that our order was putting some strain on your capacity and accordingly we pledged to work with you to the fullest extent possible, considering we also were under obligations to the prime contractor (Interstate Highway Construction) and ultimately to MDOT.

On the subject of delivery schedules, I know that you and Bill Deacon have failed to reach a meeting of the minds and the result is that he has thus far been unable to provide MDOT with a reasonable set of delivery dates. I also understand you have elected to refuse verbal communication with either Bill or David Obyc so they are forced to try to

14

conduct even the simplest of business communications via faxes. Clearly, that process impedes good communications.

Concerning the subject of timely payments, at this time I do not have any information available to me that explains why our companies apparently have a disagreement. To my knowledge your letter is the first indication that Kard feels we have been late on any payment. Considering the fact that the Toebe Company always strives to pay its bills on time I must assume there is a misinterpretation of the terms of payment.

When Bill returns on Monday he will give the payment issue his top priority but that will require direct telephone communications with you to see where the discrepancy lies. On the other hand I believe you owe him a current update on the status of your fabrication of the balance of our order.

30.   On August 22, 2005, Toebe wrote Kard in part:

Subject        S07 & S09    DELIVERIES

. . . .

Attached is a simple spreadsheet that I faxed to you on 8-11-05 requesting an update as to the fabrication of the S07 & S09 bridges. Again I am requesting you to check the appropriate box so we know what is complete. Once I receive this back we can schedule a phone conversation regarding payment issues. Let me know when you will be available.

31.   The next day, August 23, 2005, Toebe faxed Kard:

I have not heard back from you regarding the updated fabrication status and when would be a good time to discuss payment issues. We want to keep things moving forward.

32.   On the same day, August 23, 2005, Kard wrote Toebe a letter received by

Toebe on August 25, which said in part:

As stated in my fax to you on 08-17-05 if the $91,172.37 isn't paid to KARD on 08-21-05, we can't pay our suppliers by Fedex the same day as I promised them. Suppliers refused to continue to ship needed supplies for KARD to continue to work on your project on open account since we didn't pay them as

15

> we promised on 08-17-05.  They have now put us on CASH IN
> ADVANCE prior to shipment.  You know the answer, NO
> money was sent.  Your payment to us has nothing to do with
> future shipments, these invoices were for product already
> shipped and erected.  Since I couldn't get any additional
> supplies due to you not paying me to pay the suppliers to
> CONTINUE the work on your project we were forced to quit
> working on your project.  We have begun to work on another
> project that will continue for another 8-10 weeks.   The
> Contractor on this project has given us an advance to pay for
> required supplies, so we can pay our suppliers cash in
> advanced [sic] for materials for his project.

Attached to the letter was a schedule which showed that no fabrication was done on S07

Stage 2 for the most part, and no work at all was done on S09 Stages 1 and 2.

33.    However, on August 24, 2005, Kard faxed Toebe invoices for work done on

S07 Stage 2 and S09 Stages 1 and 2 with the notation:

> Here is the progress information you requested on P2
> of S07 Bridge & P1 & P2 of S09 Bridge.  We were unaware
> that we were to do Progress Billings on these jobs til [sic] your
> most recent letter.

The invoice for S07 Stage 2 was for $41,895.00, and had attached a detailed description

of work done.  The invoice for S09 Stages 1 and 2 was for $29,400.00, and had attached

a detailed description of work done.

34.    The same day, August 24, 2005, Toebe faxed to its lawyer the papers it

received from Kard stating:

> This fax was in our office when we got back from our meeting
> with you and Jim.  Call me and we can go through the fax
> together.  It appears they have not done anything on S09 yet.

35.    According to Deacon, twenty percent (20%) of the required work had been

completed on S09 Stage 1 and five percent (5%) of the required work had been done on

S09 Stage 2.

36.     On August 25, 2005, Toebe's lawyers wrote Kard a letter stating that Kard "has been and continues to be in breach of contract" for its failure to work in good faith to timely supply materials for the bridges, demanding that Kard resume fabrication to meet the following delivery schedule:

| | | |
|---|---|---|
| S09 | Stage I | September 9, 2005 |
| S07 | Stage II | October 10, 2005 |
| S09 | Stage II | October 31, 2005 |

and going on to state:

> In exchange for you agreeing to this schedule, Toebe and Ace will immediately pay you for appropriate invoiced work to date (which we understand to be $91,172.32) and pay all additional, proper invoices on a net 30 basis. Moreover, Toebe and Ace will agree to hold Kard harmless from any liquidated delay damages imposed by MDOT so long as Kard meets the above time lines.

> If, for whatever reason, you are unwilling to accept this resolution, Toebe and Ace demand that you immediately make all raw materials available for pickup by Toebe and Ace for delivery to an alternative fabricator. I remind you that Toebe paid over $400,000 for these materials and that you previously offered to permit Toebe and Ace to take the steel and move the work in your June 16 letter. You cannot both refuse to complete the work and refuse to make the materials available so Toebe and Ace may attempt to have the work completed elsewhere.

> Alternatively, if you can satisfy even some of the above dates, and will turnover [sic] the raw materials for the other stages, Toebe and Ace will immediately pay you for appropriate invoiced work to date (which we understand to be $91,172.32) and pay all additional, proper invoices on a net 30 basis. Moreover, Toebe and Ace will agree to hold Kard harmless from any liquidated delay damages imposed by MDOT for those stages completed by Kard so long as Kard meets the above time lines.

17

37.   On August 25, 2005, Toebe filed suit against Kard for breach of contract.

38.   On August 28, 2005, Kard responded to Toebe's lawyers' letter of August 25, 2005, stating in part:

> Your info that we stopped work on this Project after S07 phase I was shipped is false!  We continued to fabricate S09 in good faith still trying to get Walter Toebe to commit to a realistic delivery date that did not include liquidated damages. . . .
>
>         . . . .
>
> After KARD receives the $91,172.32, which is over 30 days, and the $16,611.52, which is due on 09-03-05, we will start to work on packing slips and skidding for Walter Toebe's pickup for the remainder of S07 phase 2, S09 phase 1 and phase 2.  We should have this completed no later than 3 days after we receive the $107,783.84.  We will list the status of the material cut, punched, drilled and etc.  Walter Toebe is to review, verify, and approve that all materials listed will complete the project.  We have already sent progress invoices for the materials that has [sic] been cut, punched, drilled and etc.  We will also work up our final invoices for loading this material on Walter Toebe's trucks.  All invoices will have to be paid in full prior to shipment.  KARD will also need a release from Walter Toebe and Ace that you listed in your letter dated 08-25-05 for liquidated damages and delay in delivery damages.

39.   Included in Kard's letter was a payment history which showed Kard had done approximately $183,000.00 in completed fabrication work which was not paid for, and payment for which was not seriously delinquent assuming a thirty (30) day due period for payment.

40.   On August 29, 2005, Toebe's lawyers wrote Kard agreeing to pay $107,783.84 of the amount Kard claimed it was owed if Kard turned over the steel it had on hand to Toebe so Toebe could go elsewhere to complete fabrication.

41.   On August 30, 2005, Toebe began to look elsewhere to complete fabrication

18

of the steel beams necessary for S07 Stage 2 and S09 Stage 1 and Stage 2.  Ultimately Toebe contracted with a second steel fabricator to do the work.  The fabricated steel beams were to be delivered to the job sites as follows:

| | |
|---|---|
| S09 Stage I | Beginning the week of September 26, 2005 |
| S07 Stage II | Beginning the week of October 17, 2005 |
| S09 Stage II | Beginning the week of October 31, 2005 |

42.   S07 was completed and open to traffic on November 12, 2005; reconstruction was completed in 160 calendar days.  S09 was completed and open to traffic on December 27, 2005; reconstruction was completed in 159 calendar days.

V.

At the time Kard quoted prospective bridge subcontractors prices for fabricating the steel beams for S07 and S09, it was aware of the MDOT completion dates and the high likelihood these dates would be extended, depending on the time the contract was let for the overall project and the time steel would be available.  Kard was also aware of the obligation of the bridge contractor to complete reconstruction of S07 and S09 in a defined period of time once reconstruction began, as well as the fact that MDOT set the schedules for beginning and completing reconstruction.

Kard knew of the Toebe-Ace relationship, and that while it agreed with Ace to do the fabrication work, payment would come from Toebe, and that Toebe would be in charge of the reconstruction of S07 and S09.

By mid-June, 2005, the steel was available for fabrication of the steel beams.  While Kard did not know the exact dates Toebe was obligated to begin reconstruction of S07 and S09, it did know that it had an obligation to complete reconstruction so that S07 and S09

19

would be open for traffic before the end of 2005.

Toebe and Kard never came to a formal agreement on delivery dates for the fabricated steel beams. Toebe continuously pressed for fixed dates; Kard repeatedly refused to set fixed dates. Kard also did not schedule its overall workload in a way that allowed it to assure delivery of the fabricated steel beams in time for Toebe to meet its obligations to MDOT.

On the other hand, Toebe knew or should have known there was a high likelihood that Kard would not complete fabrication of the steel beams for at least S09 Stage 2 in time for Teobe to meet MDOT requirements. Toebe continuously tried to put a square peg in a round hole.

When Kard received the purchase order from Ace it knew generally the time requirements for delivery of the fabricated steel beams to the job sites. Notwithstanding this fact, it did not schedule its work load to meet these requirements. In mid-June it told Toebe there was a high likelihood it was not going to perform in time to meet MDOT requirements, and Toebe should look elsewhere. Elsewhere meant it was going to cost Toebe more than Kard's prices. Toebe chose to continue with Kard rather than look elsewhere.

The breaking point in the relationship came when Kard stopped fabrication work on the assumption it would not be paid in a timely fashion. On the other hand, Toebe, when it realized Kard was about to stop work, rather than assure Kard of payment, said that until it got a firm commitment on delivery dates it was not going to pay for work done. Toebe and Kard were talking past each other. Toebe finally came to the realization that if it intended to meet MDOT time requirements, it had to go elsewhere to complete fabrication

20

of the steel beams, which it did, at an additional cost.

VI.

As stated in the Memorandum:

> "[T]he record does not disclose any term governing delivery dates to which both parties unambiguously assented."

Also as stated in the Memorandum:

> In cases where a contract contains no term governing delivery date, the UCC provides that "[t]he time for shipment or delivery or any other action under a contract if not provided in this article or agreed upon shall be a reasonable time."  Ohio Rev. Code §1302.22(A).  What is a reasonable time "depend[s] on such factors as the nature of goods to be delivered, the purpose for which they are to be used, the extent of seller's knowledge of buyer's intentions, transportation conditions, the nature of the market, and so on."  James J. White & Robert S. Summers, Uniform Commercial Code § 3-5 (5th ed. 2000).

Here Kard understood what its obligations were when it quoted on fabricating the steel beams required for an MDOT project.  It knew from the bid documents MDOT had time limits on the project work that the general contractor and the bridge subcontractor had to meet.  While there is no single document or combination of documents that memorializes an agreed-upon date for delivery of the fabricated steel beams, clearly there was an agreement between Kard and Ace to fabricate the steel beams for S07 and S09 and Toebe was a beneficiary of that agreement.

The absence of an agreed-upon date for performance by Kard involves as noted above, under § 2-309(1) of the UCC, "a reasonable time."  What is a reasonable time under the circumstances has best been explained in USEMCO, Inc. v. Marbro Co., 483 A.2d 88, 95 (Md. Ct. Spec. App. 1984):

> When there is no time for performance specified in the

21

contract, a reasonable time will be inferred from all the facts and circumstances.

There was evidence in the case, including testimony of USEMCO's manager and chief engineer and correspondence between Marbro and USEMCO's agent, Flow, from which the court could properly find, as it did, that USEMCO was aware of Marbro's deadline and the penalties it faced if it did not complete its project by that deadline. A reasonable time for performance, therefore, would be in such time as would enable Marbro, if it acted diligently, to meet its deadline, unless other factors would make that impractical.

See also White & Summers, supra.

Here a reasonable time for the fabrication of the steel beams for S07 and S09 would be such time as would enable Toebe to complete reconstruction of S09 by the end of 2005. Hence, by the end of June, 2005, Toebe knew or should have known Kard was not going to do that, and that there was a high likelihood that it would have to go elsewhere to complete fabrication of the steel beams for S09. That Toebe waited until the end of August to do so was a risk it undertook. Under these circumstances it is not the additional costs at the end of August, 2005, that Toebe incurred to get the fabrication of steel beams necessary to complete reconstruction of S09, but rather what it would have cost Toebe if it had acted in a timely fashion to do so, that is, as of July 1, 2005. These costs are still to be proven.

As to Kard's counterclaim, Toebe was not in breach of the agreement to fabricate. The invoices which were unpaid when Kard stopped fabrication were not yet due. Kard had no good reason to cease fabrication when it did. The amount that Toebe owed for fabrication work done and used in completion of S07 and S09 is a credit against what Kard owes Toebe for the additional expense Toebe incurred above the agreed upon price

because Kard failed to complete fabrication of the steel beams in a timely fashion as above described.  Accordingly, the case continues to establish Toebe's damages.

CODA

This is a case that never should have been.  Toebe and Kard are both experienced in their respective businesses.  Toebe knows how to build highway bridges; Kard knows how to fabricate steel beams for highway bridges.  In Michigan reconstruction of highway bridges is under the complete control of MDOT.  Every highway bridge reconstruction is designed and contracted for by MDOT, and there is always a time schedule for starting reconstruction with the attendant control of the flow of traffic and completing reconstruction to enable traffic to flow again unimpeded.  Toebe knew this and Kard knew this.  Kard agreed with Toebe to fabricate the steel beams necessary for reconstruction of S07 and S09.  Kard agreed to do the fabrication and knew it had to do it in a timely fashion.  Toebe ran into the problem of getting Kard to commit to a delivery date and Kard ran into problems setting a delivery date, and while they talked, they talked past each other.

Toebe stuck with Kard because it had a fixed price that it did not want to lose.  Kard stuck with Toebe because it wanted the business.  When Toebe saw Kard vacillating, it should have told Kard enough is enough and gone elsewhere with the steel still to be fabricated for which it had paid, and Kard, because it committed to do the fabrication it

23

could not do in a timely fashion, should have said it would absorb the additional cost. Instead, the two engaged in a war of written words and ended up in a courtroom.  Clearly the expense of resolving their differences in a courtroom likely far outweighs the expense of unwinding their relationship voluntarily.  Be this as it may, the case continues.

SO ORDERED.


 s/Avern Cohn_____
AVERN COHN
UNITED STATES DISTRICT JUDGE


Dated:  January 7, 2009


I hereby certify that a copy of the foregoing document was mailed to the attorneys of record on this date, January 7, 2009, by electronic and/or ordinary mail.

 s/Julie Owens_____
Case Manager, (313) 234-5160

24